## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IRVIN CEBADA MONROY; MARIA MONROY; B. C., a minor, by and through NOEL CEBADA, His Natural Father and Next Friend; E. C., a minor, by and through NOEL CEBADA, Her Natural Father and Next Friend; and I. C., a minor, by and through NOEL CEBADA, Her Natural Father and Next Friend<br><br>v.<br><br>GENERAL MOTORS LLC<br><br>Serve: GENERAL MOTORS LLC<br> c/o CSC of St. Louis County, Inc.<br> 130 South Bemiston Avenue, Suite 700<br> Clayton, MO 63105 | Case No. 1:17-cv-2921<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFFS' COMPLAINT

COME NOW Plaintiffs in the above-styled action ("Plaintiffs"), by and through their undersigned counsel, and hereby submit Plaintiffs' Complaint against Defendant GENERAL MOTORS LLC.   Based upon their personal knowledge, and upon information and belief, regarding events surrounding their auto accidents, Plaintiffs allege and aver as follows:

### I.    PRELIMINARY STATEMENT

This is a proceeding brought by Plaintiffs seeking damages for the personal injuries suffered as a result of the defective and dangerous vehicles/vehicle parts which were manufactured, developed, marketed, distributed and/or sold by General Motors Corporation and/or Defendant to the general public, the liability for which Defendant has assumed as part of "The Master Sale and Purchase Agreement" referenced to hereinto, and for Defendant's own specific knowledge and conduct. As a result of General Motors Corporation's and/or Defendant's

intentional and coordinated conduct, Plaintiffs were injured by defective and dangerous subject vehicles and/or ignition switches. As pled with additional particularity herein, the subject vehicles and/or ignition switches were defectively and negligently designed, unreasonably dangerous and defective, inadequately tested, made with manufacturing defect, dangerous to human health and safety, and lacked proper and adequate warnings as to the known dangers associated with their use. Plaintiffs are not seeking any damages for loss of use or reduced value of their vehicles. Plaintiffs are only seeking personal injury damages for physical injury or death and their related damages as a result of those physical injuries or deaths.

## II.    PARTIES

### A.    PLAINTIFFS

1.    At all relevant times, Plaintiffs resided in the United States of America. There are a total of five (5) Plaintiffs bringing claims in this action.

2.    The ignition switch, keys and related parts at issue are a component of all of the vehicles operated by the Plaintiffs.

3.    Plaintiff Irvin Cebada Monroy is a citizen of the State of Utah, residing in Midvale, Utah.  Plaintiff Irvin Cebada Monroy brings this action for his own personal injuries he sustained while traveling in a Subject Vehicle (also referred to herein as "Defective Vehicle"), specifically a 2006 Pontiac G6, which was registered in Los Angeles, California.  At all relevant times, Plaintiff Irvin Cebada Monroy was the owner of the 2006 Pontiac G6.  At the time of the accident, Plaintiff Irvin Cebada Monroy was a resident of the State of California, residing in Los Angeles.  As a result of the accident, Plaintiff Irvin Cebada Monroy moved to Midvale, Utah to help care for his family members who were also injured in the accident.

4.    Plaintiff Maria Monroy is a resident and citizen of the State of Utah. Plaintiff Maria

Monroy brings this action for her own personal injuries sustained during an auto accident while traveling in a Subject Vehicle, specifically a 2006 Pontiac G6 ("Subject Vehicle"), which was registered in Los Angeles, California.

5.    B.C., a minor, by and through Noel Cebada, as His Natural Father and Next Friend, is a resident and citizen of the State of Utah. B. C., a minor, by and through Noel Cebada, as His Natural Father and Next Friend, brings this action for personal injuries B. C. sustained during an auto accident while traveling in a Subject Vehicle, specifically a 2006 Pontiac G6, which was registered in Los Angeles, California.

6.    E. C., a minor, by and through Noel Cebada, as Her Natural Father and Next Friend, is a resident and citizen of the State of Utah. E. C., a minor, by and through Noel Cebada, as Her Natural Father and Next Friend, brings this action for personal injuries E. C. sustained during an auto accident while traveling in a Subject Vehicle, specifically a 2006 Pontiac G6, which was registered in Los Angeles, California.

7.    I. C., a minor, by and through Noel Cebada, as Her Natural Father and Next Friend, is a resident and citizen of the State of Utah. I. C., a minor, by and through Noel Cebada, as Her Natural Father and Next Friend, brings this action for personal injuries I. C. sustained during an auto accident while traveling in a Subject Vehicle, specifically a 2006 Pontiac G6, which was registered in Los Angeles, California.

**B.    DEFENDANT**

8.    Defendant GENERAL MOTORS LLC ("New GM" or "Defendant") is not a citizen of the states mentioned above. General Motors LLC is (and was at the time this lawsuit was filed) a Delaware limited liability company with its principal place of business in Michigan. General Motors LLC's sole member and 100 percent owner is General Motors Holdings LLC, which is

also a Delaware limited liability company with its principal place of business in Michigan. General Motors Holdings LLC's sole member and 100 percent owner is Defendant General Motors Company, which is (and was at the time this lawsuit was filed) a publicly traded Delaware corporation with its principal place of business in Michigan, making General Motors LLC a citizen and resident of Delaware and Michigan.  Defendant General Motors LLC can be served through its registered agent CSC of St. Louis County, Inc.  130 South Bemiston Avenue, Suite 700 Clayton, MO 63105.

9.    With respect to the facts alleged and claims asserted in this Complaint, New GM is the corporate successor of General Motors Corporation ("Old GM"), which filed a voluntary Petition for relief under Chapter 11 of the U.S. Bankruptcy Code on June 1, 2009. (General Motors Corporation and General Motors LLC will be collectively referred to as "GM"). On or about July 10, 2009, New GM acquired substantially all of the assets and assumed certain liabilities of Old GM by way of a Section 363 sale under Chapter 11 of the Bankruptcy Code. Plaintiffs' causes of action in this lawsuit are brought against New GM for acts or omissions that occurred after July 10, 2009, and Plaintiffs do not assert any causes of action against Old GM. Although this Complaint references facts against Old GM, it is for background and reference purposes only. At all times relevant to the claims in this lawsuit, GM has been in the business of developing, manufacturing, and marketing cars throughout the states listed herein and the entire United States of America.

10.    General Motors Corporation was a Delaware corporation with its headquarters and principal place of business in Detroit, Michigan. The Corporation, through its various entities, designed, manufactured, marketed, distributed, and sold Pontiac, Saturn, Chevrolet and other brand automobiles in Missouri and multiple other locations in the United States and worldwide.

11.     No claims in this Lawsuit seek damages for injuries or deaths prior to July 10, 2009.

12.     Under the Agreement, Defendant GM also expressly assumed certain liabilities of General Motors Corporation, including certain statutory requirements:

> From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller.

13.     Moreover, under the Agreement, GM agreed that it would "assume and thereafter pay or perform as and when due, or otherwise discharge, all of the Assumed Liabilities." The "Assumed Liabilities" were defined to include:

> (ix) all liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by [General Motors Corporation] (collectively, "Product Liabilities"), which arise directly out of accidents, incidents or other distinct and discreet occurrences that happen on or after the Closing Date and arise from such motor vehicles' operation or performance…

14.     In the Sale Agreement, New GM expressly agreed that it:

> shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [Old GM] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser prior to or after the Closing and (ii) Lemon Laws.

15.     At all times relevant herein, Defendant GM were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Subject Vehicles, as described in this Complaint,

and other motor vehicles and motor vehicle components throughout the United States.

### III.    VENUE AND JURISDICTION

16.    Complete diversity exists between Plaintiffs and Defendant. Plaintiffs are each seeking damages in excess of $75,000.00, exclusive of interest and costs. Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1332. Further, all claims are timely filed under the applicable state law from the date of accident or the date of recall, or other applicable date. Further, any allegedly applicable statute of limitation or statute of repose should be equitably or lawfully tolled or the Defendant equitably estopped from asserting any such affirmative defense or claim due to Defendant's purposeful and fraudulent concealment of the defects, which are subject of this lawsuit. Plaintiffs could not have known or been on reasonable notice of the Defendant's illegal conduct or the defects until they received actual notice of the applicable vehicle recall. Defendant's lack of timely recalls and failure to notify the U.S. Government of the accidents and injuries leading up to the recalls was done to dissuade or prevent civil claims against Defendant. As set forth more fully below, Defendant has unclean hands from its own behavior from July 10, 2009 to the present that should prevent its assertion of any statute of limitation or statute of repose affirmative defense.

17.    Pursuant to the Court's instructions, Plaintiffs may file directly in the MDL court and reserve the right to have filed in another district. Plaintiffs filed in this District in order to advance the efficient and orderly resolution of claims arising from Defendant's conduct and its attendant nationwide devastating effects. Filing in this District does not alter the choice-of-law analysis and does not waive Plaintiffs' rights to transfer to another district at the conclusion of pretrial proceedings in this case. Therefore, this Complaint is filed by Plaintiffs as if they had filed in the district in which their accidents occurred, or other lawful jurisdiction.

- For Plaintiff Irvin Cebada Monroy, this Complaint is filed as though it were filed in the United States District Court for the Central District of California, Los Angeles Division.

- For Plaintiff Maria Monroy, this Complaint is filed as though it were filed in the United States District Court for the Central District of California, Los Angeles Division.

- B. C., a minor, by and through Noel Cebada, His Natural Father and Next Friend, this Complaint is filed as though it were filed in the United States District Court for the Central District of California, Los Angeles Division.

- For Plaintiff E. C., a minor, by and through Noel Cebada, Her Natural Father and Next Friend, this Complaint is filed as though it were filed in the United States District Court for the Central District of California, Los Angeles Division.

- For E. C., a minor, by and through Noel Cebada, Her Natural Father and Next Friend, this Complaint is filed as though it were filed in the United States District Court for the Central District of California, Los Angeles Division.

18.    This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction.  This Court has personal jurisdiction over New GM because New GM conducts substantial business in this District, and upon information and belief, consents to jurisdiction.

19.    Venue is proper in this District under 28 U.S.C. § 1391 because New GM, as a corporation, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.

## IV.    GENERAL ALLEGATIONS

### A.  BACKGROUND

20.    Plaintiffs incorporate as if fully set forth herein all allegations set forth in the Fourth

Amended Consolidated Complaint filed in 14-MD-2543.

21.     The term "Subject Vehicles" or "Defective Vehicles" refers to the following vehicles, classified by defect and NHTSA Recall No., as further alleged in this Complaint.

(i)     Delta Ignition Switch Vehicles (the vehicles included in Recall No. 14v047: 2005-2010 Chevy Cobalt; 2006-2011 Chevy HHR; 2007-2010 Pontiac G5; 2007-2010 Saturn Sky; 2003-2007 Saturn ION; and 2006-2010 Pontiac Solstice);

(ii)    Low Torque Ignition Switch Vehicles (the vehicles included in Recall Nos. 14v355, 14v396, and 14v400: 2005-2009 Buick Lacrosse, 2006-2014 Chevrolet Impala, 2000-2005 Cadillac Deville, 2006-2011 Cadillac DTS, 2006-2011 Buick Lucerne, and 2006-2008 Chevrolet Monte Carlo; 2003-2014 Cadillac CTS and the 2004-2006 Cadillac SRX; and 1997-2005 Chevrolet Malibu, 2000-2005 Chevrolet Impala, 2000-2005 Chevrolet Monte Carlo, 2000-2005 Pontiac Grand Am, 2004-2008 Pontiac Grand Prix, 1998-2002 Oldsmobile Intrigue, and 1999- 2004 Oldsmobile Alero);

(iii)   Knee-to-Key Camaro Defect Vehicles (the vehicles included in Recall No. 14v346: 2010-2014 Chevrolet Camaro);

(iv)    Side Airbag Defect Vehicles (the vehicles included in Recall No. 14v118: 2008- 2013 Buick Enclave, 2009-2013 Chevrolet Traverse, 2008-2013 GMC Acadia, and 2008-2010 Saturn Outlook); and

(v)     Power Steering Defect Vehicles (the vehicles included in Recall No. 14v153: 2004-2006 and 2008-2009 Chevrolet Malibu, 2004-2006 Chevrolet Malibu Maxx, 2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2005-2006 and 2008-2009 Pontiac G6, 2004-2007 Saturn Ion, and 2008-2009 Saturn Aura).

22.     The Delta Ignition Switch Vehicles, Low Torque Ignition Switch Vehicles, and

Knee-to-Key Camaro Defect Vehicles are sometimes collectively referred to as the "Defective Ignition Switch Vehicles."

23.    Millions of vehicles were sold in the United States equipped with the Ignition Switches and electronic stability control systems.

24.    The Ignition Switches in the Subject Vehicles turn on the vehicle's motor engine and main electrical systems when the key is turned to the "run" or "on" position. The Ignition Switches have several common switch points, including "RUN" (or "ON"), "OFF," and "ACC" ("accessory"). At the "run" position, the vehicle's motor engine is running and the electrical systems have been activated; at the "accessories" position the motor is turned off, and the electrical power is generally only supplied to the vehicle's entertainment system; and at the "off" position, both the vehicle's engine and electrical systems are turned off. In most vehicles, a driver must intentionally turn the key in the ignition to move to these various positions.

25.    General Motors Corporation and or Defendant installed the Ignition Switches in certain vehicle models, including Plaintiffs' vehicles. Defendant knew the Ignition Switches were defectively designed, but nonetheless continued to manufacture and sell the Ignition Switches with the knowledge that they would be used in GM vehicles, including the Subject Vehicles. Defendant, with the same knowledge and post Agreement, continued to promote the sale and use of these vehicles without issuing recall.

26.    Because of defects in their design, the Ignition Switches installed in the Subject Vehicles are, by their nature, loose and improperly positioned, and require too little force to move, and are susceptible to failure during normal and expected conditions. The ignition module is located in a position in the vehicle that allows a driver to contact the key ring, and inadvertently switch the ignition position. Further, even a road bump or jarring can switch the ignition position.

Due to faulty design and improper positioning, the Ignition Switches can unexpectedly and suddenly move from the "on" or "run" position while the vehicle is in operation to the "Off" or "Acc" position ("Ignition Switch Defect or Power Steering Defect"). When this ignition switch failure occurs, the motor engine and certain electrical components such as power-assisted steering and anti-lock brakes are turned off, thereby endangering the vehicle occupants and compromising the safety airbag system.

27.    The Ignition Switch Defect can occur at any time during normal and proper operation of the Subject Vehicles, meaning the ignition can suddenly switch off while it is moving at 70 mph on the freeway, leaving the driver unable to control the vehicle and vulnerable to a nonfunctioning safety airbag system.

28.    The Ignition Switch Defect precludes drivers and owners of the Subject Vehicles, such as Plaintiffs from proper and safe use of their vehicles, reduces vehicle occupant protection, and endangers them and other vehicle occupants. However, no driver or owner of the Subject Vehicles, including Plaintiffs, knew, or could reasonably have discovered, the Ignition Switch Defect, prior to it manifesting in a sudden and dangerous failure during their auto accidents.

29.    Upon information and belief, prior to the sale or use of the Subject Vehicles, GM knew of the Ignition Switch Defect through sources such as pre-release design, manufacturing, and field testing data; in-warranty repair data; early consumer complaints made directly to GM, collected by the National Highway Transportation Safety Administration's Office of Defect Investigation ("NHTSA ODI") and/or posted on public online vehicle owner forums; field testing done in response to those complaints; aggregate data from GM dealers; and accident data. Despite this knowledge, GM failed to disclose and actively concealed the Ignition Switch Defect from Plaintiffs and the public, and continued to market and advertise the Subject Vehicles as reliable,

and safe vehicles, which they are not. Much of this knowledge was obtained as early as 2001.

30.     As a result of the Ignition Switch Defect and Defendant's alleged actions, Plaintiffs were harmed and suffered actual damages and personal injuries, in that the Subject Vehicles are unsafe, unfit for their ordinary and intended use, and have manifested, or are at unreasonable risk of manifesting, the Ignition Switch Defect by way of a sudden and dangerous failure that puts them and others at serious risk of injury or death. Drivers and owners of the Subject Vehicles, including Plaintiffs, did not receive vehicles that would reliably operate with reasonable safety, and that would not place drivers and occupants in danger of encountering an ongoing and undisclosed risk of harm, which could have been avoided, as GM knew but did not disclose, through the use of non-defective ignition parts.

31.     As part of these recalls, New GM admitted that if the key ring is carrying added weight and the vehicle goes off road or experiences some other jarring event, it may unintentionally move the key away from the "Run" position.

32.     New GM further admitted that if this occurred, engine power, power steering, and power braking will be affected, increasing the risk of a crash or vehicle stall.

33.     GM began installing defective ignition switches beginning as early as 2000 in certain GM vehicle models. Upon information and belief, GM knew the ignition switches were defectively designed, but nonetheless continued to manufacture and sell defective ignition switches with the knowledge that they would be used in GM vehicles, including the Subject Vehicles.

34.     As background, and not as a basis for damages, the recently published "Report to the Board of Directors of General Motors Company Regarding Ignition Switch Recalls" authored by Anton R. Valukas ("The Valukas Report"), provides that GM made a conscious decision, in the

fall of 2002, to use the defective ignition switch in the Subject Vehicles "that was so far below GM's own specifications that it failed to keep the car powered on in circumstances that drivers would encounter." GM knew of, and approved, the final version of the Ignition Switch that was installed in millions of cars despite knowing that the force required to disengage the ignition switch was far below minimum specifications.

35.    As background, and not as a basis for damages, according to documents obtained by a United States House of Representatives committee during an investigation into the Defective Ignition Switches, GM opened an opened an engineering inquiry about the defective Ignition Switch in 2004 after customers complained that the Subject Vehicles could be turned off while driving.

36.    As background, and not as a basis for damages, in addition, as early as 2005, GM knew that a key hole design modification that would require a piece price increase of $0.50 per vehicle could prevent certain movements in the ignition switch of certain GM vehicles with the same or similar ignition switches. Yet GM found that the part was too expensive and the change would take too much time.

37.    Because of defects in their design, the ignition switches installed in the Subject Vehicles are, by their nature, loose and/or improperly positioned and are susceptible to failure during normal and expected conditions. The key sold with the Plaintiff's vehicles has a slot design which allows the key fob or chain to hang lower on the key and increases the chance of the key inadvertently moving from the "Run" to "Accessory" or "Off" position during ordinary driving maneuvers (the "Ignition Switch Defect"). When this ignition switch failure occurs, the motor engine and certain electrical components such as power-assisted steering and anti-lock brakes are turned off, thereby endangering the vehicle occupants and compromising the safety vehicles'

safety features.

38.    The Ignition Switch Defect can occur at any time during normal and proper operation of the Subject Vehicles, meaning the ignition can suddenly switch off while it is moving at 70 mph on the freeway, leaving the driver unable to control the vehicle, and vulnerable to a nonfunctioning safety system.

39.    The Ignition Switch Defect precludes drivers and owners of the Subject Vehicles, such as Plaintiffs, from proper and safe use of their vehicles, reduces vehicle occupant protection, and endangers them and other vehicle occupants. However, no driver or owner of the Subject Vehicles, including the Plaintiffs, knew, or could reasonably have discovered, the Ignition Switch Defect, prior to it manifesting in a sudden and dangerous failure.

40.    Upon information and belief, prior to the sale of the Subject Vehicles, GM knew of the Ignition Switch Defect through sources such as pre-release design, manufacturing, and field testing data; in-warranty repair data; early consumer complaints made directly to GM, collected by the National Highway Transportation Safety Administration's Office of Defect Investigation ("NHTSA ODI") and/or posted on public online vehicle owner forums; field testing done in response to those complaints; aggregate data from GM dealers; and accident data. Despite this knowledge, GM failed to disclose and actively concealed the defects in the ignition switch from the Plaintiffs and the public, and continued to market and advertise the Subject Vehicles as reliable and safe vehicles, which they are not.

41.    As a result of GM's misconduct, the Plaintiffs suffered actual damages and physical injuries, in that the Subject Vehicles are unsafe, unfit for their ordinary and intended use, and have manifested, or are at unreasonable risk of manifesting, the Ignition Switch Defect by way of a sudden and dangerous failure that puts them and others at serious risk of injury or death. Drivers

and owners of the Subject Vehicles, including the Plaintiffs, did not receive the benefit of their bargain as purchasers and/or lessees, received vehicles that were of a lesser standard, grade, and quality than represented, and did not receive vehicles that met ordinary and reasonable consumer expectations. Drivers and owners of the Subject Vehicles, including the Plaintiffs, did not receive vehicles that would reliably operate with reasonable safety, and that would not place drivers and occupants in danger of encountering an ongoing and undisclosed risk of harm, which could have been avoided, as GM knew but did not disclose, through the use of non-defective ignition parts. This paragraph does not seek any damages for any economic loss of value of the Subject Vehicles nor any consumer fraud damages.

42.     All of the subject vehicles used by Plaintiffs have identical or substantially similar defective ignition switches, keys, electronic stability control systems, and or defective airbag deployment systems.

43.     All of the subject vehicles used by the Plaintiffs are subject to the same negligent and untimely recall(s) by Defendant, including but not limited to NHTSA Recalls 14V355.

44.     All of the subject vehicles used by the Plaintiffs are identical or substantially similar in design, manufacture, production, sale, and operation.

45.     All of the defects alleged by Plaintiffs arise out of identical or substantially similar accidents including frontal collisions with no air bag deployment, engine shut offs during operation, electronic stability control systems, braking difficulty or failure due to engine shut off, and steering difficulty or failure due to engine shut off, and Plaintiffs' claims arise out of the same series of transactions and occurrences, and involve common questions of law and or fact.

46.     Plaintiffs' claims are logically related because all Plaintiffs allege the same claims related to their operation of a subject vehicle and/or vehicle with a defective ignition switch and/or

electronic stability control system. Further, these subject vehicles and/or ignition switches were defectively designed, manufactured, marketed and sold by Defendant, and Defendant failed to provide appropriate warnings and instructions regarding the dangers posed by these subject vehicles and/or ignition switches and electronic stability control systems.

47.     Defendant's conduct in designing, developing, marketing, selling, distributing, and failing to timely recall or warn of the subject vehicles and/or ignition switches relates to all Plaintiffs and provides a common universe of facts underlying Plaintiffs' claims, such that Plaintiffs' claims against Defendant arise from the same transaction or occurrence or the same series of transactions or occurrences.

48.     Plaintiffs suffered injuries and damages following as a result of Defendant's subject vehicles and/or ignition switches and electronic stability control systems, and common liability facts will be presented to demonstrate that Defendant knew or should have known that these vehicles caused such serious injuries and death.

49.     Discovery will be virtually identical for all Plaintiffs' claims with respect to Defendant's conduct and regulatory violations, as all claims arise out of the same acts and/or omissions of Defendant and involve common questions of law and/or fact.

50.     Joinder of Plaintiffs' claims is proper because Plaintiffs' claims arise out of the same acts and/or omissions of Defendant and involve common questions of law and/or fact, including vehicles that have all been recalled by Defendant and all were in the same accident caused by the defective nature of the vehicle. Further, joinder supports judicial efficiency, conserves the parties and court's resources, prevents duplicative discovery, and serves the interests of justice.

i.      **Lack of Knowledge by Plaintiffs**

51.     No reasonable consumer expects that the vehicle that he or she purchases or leases contains a known but undisclosed design defect that poses a safety risk at the time of purchase or lease or use.

52.     The presence and dangerous consequences of the Ignition Switch Defect were known prior to the July 2009 Agreement, yet, the Defendant continued to conceal that information from safety regulators and the public.

**ii.     GM's Belated Repair Recall of Some Vehicles**

53.     On February 7, 2014, GM filed a Part 573 Defect Notice with the NHTSA to recall 2005 to 2007 model year Chevrolet Cobalt and 2007 Pontiac G5 vehicles. The notice stated that the "ignition switch torque performance may not meet General Motors' specifications," explaining that if "the key ring is carrying weight or the vehicle goes off road or experiences some other jarring event, the ignition switch may inadvertently be moved out of the 'run' position" and may result in deactivating the airbags. The notice did not acknowledge that the Ignition Switch Defect could occur under normal driving conditions, even when the key ring is not carrying added weight.

54.     The notice also did not identify all the vehicles affected by the Ignition Switch Defect.

55.     The notice failed to indicate the full extent to which GM has been aware of the Defect. The notice suggests that GM's knowledge of the defect is recent, stating that "[t]he issue was presented to the Field Performance Evaluation Review Committee and on January 31, 2014, the Executive Field Action Decision Committee decided to conduct a safety recall."

56.     In a February 24, 2014 letter to the NHTSA, GM amended the Part 573 Report to include a more detailed chronology. The chronology indicated that GM first learned of the Ignition Switch Defect during the launch of the 2005 Chevrolet Cobalt from field tests by its engineers.

57.     On February 25, 2014, GM amended its Part 573 Report to cover additional models and model years due to the same Ignition Switch Defect. Specifically, GM identified the 2003 to 2007 model years of the Saturn Ion; 2006 and 2007 model years of the Chevrolet HHR; 2007 model year of the Pontiac Solstice; and, 2007 model year of Saturn Sky vehicles.

58.     According to the NHTSA Acting Administrator David Friedman, the chronology information provided by GM on February 24, 2014 "raise[d] serious questions as to the timeliness of GM's recall." Therefore, the NHTSA opened a "timeliness query" on February 26, 2014.

59.     On March 4, 2014, the NHTSA issued GM a Special Order demanding that it provide additional information by April 3, 2014, on 107 specific requests, including information to "evaluate the timing of GM's defect decision making and reporting of the safety defect to NHTSA."

60.     On March 11, 2014, GM filed a new Part 573 report superseding its February 25 filing. The new chronology provided with the report indicated that GM was aware of the Ignition Switch Defect in 2001—significantly earlier than its previous 2004 disclosure. GM now indicated that it had a report from 2001 that revealed a problem with the ignition switch during pre-production of the Saturn Ion.

61.     On March 28, 2014, GM filed a new Part 573 report, which expanded the recall set forth in its February 25, 2014 filing. GM's March 28 report indicated that several additional model year vehicles may be affected by the Ignition Switch Defect. GM identified those vehicles as the 2008-2010 Chevrolet Cobalt; 2008-2011 Chevrolet HHR; 2008-2010 Pontiac Solstice; 2008-2010 Pontiac G5; and, 2008-2010 Saturn Sky. The March 28 report added over one million vehicles to the total affected by the Ignition Switch Defect.

62.     GM notified dealers of the Subject Vehicles of the recall in February and March

2014. GM also notified owners of the Subject Vehicles by letter of the recall. The letter minimized

the risk of the defect, indicating that the Ignition Switch Defect would occur only "under certain

conditions" and emphasized that the risk increased if the "key ring is carrying added weight . . . or

your vehicle experiences rough road conditions."

63.    Defendant reviewed information and tested vehicles in Spring and early Summer

2014. As a result of that testing and data review, GM decided to expand the ignition switch recall

to other subject vehicles in NHTSA Recalls 14v3550000, 14v400000, 14v540000, 14v394000 and

14v346000.

64.    Defendant knew and had actual knowledge of the facts leading to the recalls listed

above as early as 2001 for some models and had actual knowledge of these defects on July 11,

2009. In the alternative, Defendant should have known of these defects.

65.    GM prior to the recalls listed above, did not inform the public of the known defect

with its ignition switch.

66.    112. Defendant entered into a Deferred Prosecution Agreement with the United

States Department of Justice concerning the ignition switch on or about September 16, 2015. The

facts listed in paragraphs 1 to 115 in Exhibit C of the Deferred Prosecution Agreement as admitted

by Defendant are true and accurate. A true and accurate copy of the Deferred Prosecution

Agreement is attached hereto as Exhibit "A" and incorporated herein by reference.

67.    Defendant entered into an agreement with the National Highway Traffic Safety

Administration concerning violations of safety regulations related to the ignition switch. A

Consent Order was entered regarding the terms and conditions of this agreement on or about May

16, 2014. As part of the Consent Order, Defendant was ordered to pay the maximum civil penalty

of $35,000,000.00 to the United States for Defendant's ignition switch-related violations of safety

regulations.

68.     Defendants recalls stated above, though announced from February 2014 through late Summer 2014, are the same or similar defect. Defendant's choice to recall or review information at differing times, does not alter that these defects stem from same or similar low torque ignition switches and/or key systems.

**B. THE SUBJECT INCIDENTS.**

69.     On April 29, 2015, Plaintiff Maria Monroy was operating a Subject Vehicle, a 2006 Pontiac G6 manufactured and sold by Defendant. The vehicle's VIN is: 1G2ZM151664192663. On that date, due to the Ignition Switch Defect/Power Steering Defect, and the defects set forth herein, Plaintiff Irvin Cebada Monroy's 2006 Pontiac G6 ("Subject Vehicle") lost power to the engine while Plaintiff Maria Monroy was steering the car, which was also carrying Plaintiff Maria Monroy's three (3) minor children, E. C., I. C., and B. C., as well as, her adult son Irvin Cebada Monroy.  She then lost control of her vehicle, careening into a cement block before rolling over end over end multiple times.  Despite a significant impact, all but one of Subject Vehicle's air bags did ***not*** deploy in the crash due to the defects set forth herein.  If such airbags had deployed, Plaintiff Maria Monroy; Plaintiff Irvin Cebada Monroy; E. C., a minor; B. C., a minor; and I. C., a minor ("Plaintiffs") would either not have suffered injuries or would have suffered greatly reduced injuries.  Defendant's defects as alleged herein were the direct and proximate cause of Plaintiff Maria Monroy's, Plaintiff Irvin Cebada Monroy's, E. C.'s, B. C.'s, and I. C.'s injuries. Plaintiffs would either not have suffered injuries or would have suffered greatly reduced injuries.

70.     To Plaintiffs' knowledge and understanding, the vehicle listed in the previous paragraph had not been substantially modified or changed in any material way from its initial condition as designed, manufactured, marketed, and sold by the General Motors Corporation

and/or Defendant, and Plaintiffs were unaware of any defect with the vehicle or its components prior to the incident described herein.

71.    Plaintiffs herein all were in the same auto accidents that involve the Ignition Switch Defects and/or electronic stability control systems of Defendant's recalled vehicles. These accident involved either/or: 1) engine, braking, and steering failure from the ignition defect; or 2) frontal collisions with no air bag deployment; or 3) both.

72.    As a result of the collisions described above, Plaintiffs suffered serious physical injuries and Defendant's defects as alleged herein were the direct and proximate cause of their injuries.

73.    Unbeknownst to the Plaintiffs, the vehicle had serious and unreasonably dangerous defects with the ignition switches, electronic stability control system, steering system defect, vehicle crashworthiness, and/or lack of airbag sensors for rollover vehicle accident protection. Specifically, the ignition switch had the ability to change from the "Run" position to the "Accessory" position while the vehicle was moving, thereby causing the engine to lose power with a resultant loss of power to the steering, brakes, and other essential safety functions of the car. This defective condition directly resulted in a loss of safety functionality exactly at the time and place where the Plaintiffs most needed these essential functions to lessen the impact of the collisions. Additionally, at virtually any time, their vehicle's electronic power steering assist could shut off, making it extremely difficult to steer the vehicle. This defective condition directly resulted in a loss of safety functionality exactly at the time and place where the Plaintiff most needed these essential functions and resulted in GM's production and sale of millions of Defective Vehicles.

74.    For example, more than 12 million New GM and Old GM vehicles contained a defective ignition switch and cylinder. In all of these vehicles, the key position of the lock module

is located low on the steering column, in close proximity to the driver's knee. The ignition switch in the Defective Ignition Switch Vehicles is prone to fail during ordinary and foreseeable driving situations. New GM initially recalled 2.1 million Defective Ignition Switch Vehicles in February and March of 2014 (the "Delta Ignition Switch Vehicles"), and it was this initial recall that set in motion the avalanche of recalls that is described in this Complaint. In June and July of 2014, New GM recalled an additional 11 million vehicles, ostensibly for distinct safety defects involving the ignition and ignition key. As set forth below, however, each of these recalls involves a defective ignition switch, and the consequences of the defect in each of the recalled vehicles are substantially similar, if not identical. In each case, a defective ignition switch is located in an unreasonable position on the steering cylinder and can cause the vehicle to stall, disable the power steering and power brakes, and disable the airbag system in normal and foreseeable driving circumstances. In each case, New GM was aware of the defect well before it finally recalled the Defective Ignition Switch Vehicles in 2014.

75.    More specifically, the ignition switch can inadvertently move from the "run" to the "accessory" or "off" position at any time during normal and proper operation of the Defective Ignition Switch Vehicles. The ignition switch is most likely to move when the vehicle is jarred or travels across a bumpy road; if the key chain is heavy; if a driver inadvertently touches the ignition key with his or her knee; or for a host of additional reasons. When the ignition switch inadvertently moves out of the "run" position, the vehicle suddenly and unexpectedly loses engine power, power steering, and power brakes, and certain safety features are disabled, including the vehicle's airbags. This leaves occupants vulnerable to crashes, serious injuries, and death.

76.    The ignition switch systems at issue are defective in at least three major respects.

77.    First, some of the switches are simply weak; because of a faulty "detent plunger,"

the switch can inadvertently move from the "run" to the "accessory" position. Though the public believes this detent issue is limited to vehicles in the 2.1 million initially recalled, this problem exists in other models as well, including the 3.14 million cars recalled in June 2014, and 5.8 million cars recalled in July 2014. Second, because some of the ignition switches are placed low on the steering column, the driver's knee can easily bump the key (or the hanging fob below the key) and cause the switch to inadvertently move from the "run" to the "accessory" or "off" position.

78.    Third, when the ignition switch moves from the "run" to the "accessory" or "off" position, the vehicle's power is disabled. This also immediately disables the airbags. Thus, when power is lost during ordinary operation of the vehicle, a driver is left without the protection of the airbag system even if he or she is traveling at high speeds.

79.    New GM was aware of safer alternative designs for airbag systems that would have prevented the non-deployment of airbags caused by the ignition switch defects, but chose not to employ them—whether by way of recall of Old GM vehicles or a design change for the New GM vehicles it manufactured—in part to avoid disclosure of the defective ignition switches and their tragic consequences.

80.    Both Old GM and New GM also failed to thoroughly conduct an industry standard Failure Modes and Effects Analysis ("FMEA") on the ignition systems in the Defective Ignition Switch Vehicles during and after their design. FMEA is an engineering risk assessment technique used in design and failure analysis to define, identify, and eliminate known and/or potential failures, problems, and errors from the system/design before they reach the customer.

81.    An FMEA asks, "What happens if a failure actually occurs?" While Old GM and New GM and/or their suppliers conducted component-part FMEAs, Old GM and New GM did not conduct system-wide FMEAs, that is, an FMEA for the system in which the component was

included.  This is a violation of industry standard engineering practices. Had system-level FMEAs been properly conducted, the downstream effects of the ignition switch defects—such as disabling the airbags—would have been identified at the design stage and before the Defective Ignition Switch Vehicles were sold. The same FMEA failures also occurred with respect to the Side Airbag Defect and Power Steering Defect.

82.    Barra's admission of New GM's failures was followed by New GM's admission, in a Statement of Facts that is part of a Deferred Prosecution Agreement ("DPA") with the United States, that New GM "falsely represented to consumers that vehicles containing the defect posed no safety concern." Statement of Facts ¶ 3.

83.    New GM's violation of the rules governing car manufacturers was egregious.

84.    From the date of its inception on July 10, 2009, it manufactured and sold millions of vehicles that were not safe and were defective. New GM also failed to disclose the truth about its patent inability to manufacture and sell safe and reliable vehicles and its systematic scheme to misrepresent the safety and reliability of its vehicles, and failed to remedy the defects in millions of New GM and Old GM vehicles that were on the road—defects that were known to New GM but concealed from consumers, vehicle owners and lessees, and the regulators.[1] These violations were in derogation of express obligations New GM agreed to undertake, and of various laws.

85.    The failures are even more egregious when juxtaposed with the promises and messaging New GM constantly delivered to consumers. New GM led consumers in the United States and worldwide to believe that, after Old GM's bankruptcy, New GM was a new company. For example, in numerous public announcements and public filings, such as in its 2012 Annual Report excerpted below, New GM repeatedly proclaimed that it was a company committed to

---

[1] The term "New GM vehicles" refer to vehicles manufactured by New GM, and "Old GM vehicles" refers to vehicles manufactured by Old GM.

innovation, safety, and building "the best vehicles."

86.    New GM was successful in selling its "processes and culture change" and building "the best vehicles in the world" story. Sales of all New GM models went up, and New GM became profitable. As far as the public knew, a new General Motors was born, and the New GM brand and GM models stood strong in the eyes of consumers.

87.    New GM's promises were an illusion given New GM's egregious failure to disclose, and the affirmative concealment of, ignition switch defects and a plethora of other safety and quality defects in New GM vehicles and Old GM vehicles. New GM concealed the existence of the many known safety and quality defects plaguing many models and years of New GM vehicles and Old GM vehicles, and that New GM valued cost-cutting over safety.

88.    Concurrently, New GM marketed its vehicles as "safe" and "reliable," and claimed that it built the "world's best vehicles." Consequently, New GM enticed all post-July 10, 2009 purchasers of New GM Defective Vehicles, and New GM Certified Pre-Owned Vehicles to buy or lease vehicles under false pretenses, and deprived them of the benefit of their bargain. And New GM's concealment of its safety and quality problems caused owners of Old GM Defective Vehicles to retain vehicles that they would not have retained and which were worth less than they would have been but for New GM's concealment of the defects.

89.    A vehicle made by a reputable manufacturer of safe and reliable vehicles is worth more than an otherwise similar vehicle made by a disreputable manufacturer that is known to devalue safety and to conceal serious defects from consumers and regulators. New GM vehicle Safety Chief, Jeff Boyer, recently highlighted the heightened materiality of safety to consumers: "Nothing is more important than the safety of our customers in the vehicles they drive." Yet New GM failed to live up to this commitment, instead choosing to conceal more than 70 serious defects

in over 27 million New GM vehicles and Old GM vehicles sold in the United States.  And the value of all New GM and Old GM Defective Vehicles has diminished as a result of the widespread publication of those defects and New GM's corporate culture of ignoring and concealing safety defects.

90.    The systematic concealment of known defects was deliberate, as New GM followed a consistent pattern of endless "investigation" and delay each time it became aware of a given defect, as epitomized by the Delta Ignition Switch Defect and cover-up that gave rise to a criminal wire fraud investigation that was recently resolved through a Deferred Prosecution Agreement ("DPA") with the United States Department of Justice. Recently revealed documents show that New GM valued cost-cutting over safety, New GM's personnel were trained to **never** use the word "defect," "stall," or other words suggesting that any New GM or Old GM vehicles are defective, New GM routinely chose the cheapest parts supplier without regard to safety, and New GM discouraged employees from acting to address safety issues.

91.    In addition, New GM was plagued by what CEO Mary Barra euphemistically calls "transactional decision making," in which New GM employees "color[] inside the lines of their own precise job description without thinking independently or holistically," *i.e.*, without looking at the larger issue of safety.[2]

92.    In light of New GM's systemic devaluation of safety issues, it is not surprising that, from the date of its inception, New GM itself produced a grossly inordinate number of vehicles with serious safety defects and kept silent about Old GM vehicles it knew had defects. Until 2014, New GM was successful in concealing both its disregard of safety and the myriad defects that existed in Old GM vehicles and New GM vehicles because of that disregard.

---

[2] TIME MAGAZINE, October 6, 2014, p. 36.

93.     According to the administrator of the National Highway Traffic Safety Administration ("NHTSA"), New GM worked to hide documents from NHTSA and created firewalls to prevent people within New GM from "connecting the dots" with respect to safety issues and defects.

94.     The array of concealed defects is astounding and goes far beyond the Delta Ignition Switch Defect, the belated revelation of which sparked New GM's 2014 serial recalls.  The defects affected virtually every safety system in Old and New GM vehicles, including, but by no means limited to, the airbags, seatbelts, brakes, brake lights, electronic stability control, windshield wipers, sensing and diagnostic modules, and warning chimes.

95.     Old and New GM's engineering and inventory process was in such disarray that some recalled vehicles might or might not have a defective part—because New and Old GM simply did not know which of their cars had parts that made them unsafe. This in itself violated sound engineering and inventory manufacturing practices.

96.     New GM received reports of crashes, deaths, injuries, and safety concerns expressed by vehicle owners that put New GM on notice of the serious safety issues presented by these defects. New GM knew and was fully aware of the now infamous Delta Ignition Switch Defect (and many other serious defects in numerous models of Old GM vehicles, including the Defective Vehicles) *from the very date of its inception on July 10, 2009*. For example, at least two dozen New GM employees, many high-level or in positions of influence, knew of the Delta Ignition Switch Defect as of that date. Many of these same executives were aware of the Low Torque Ignition Switch Defect, the Knee-to-Key Camaro Defect and the Power Steering Defect, as well as other defects described herein.

97.     New GM's claims that the defects were known only to lower-level engineers is

false. For example, current CEO Mary Barra, while head of product development, was informed in 2011 of the Power Steering Defect in several models. Despite 4,800 consumer complaints and more than 30,000 warranty repairs, New GM waited until 2014 to disclose this defect.

98. New GM's claims about its own conduct in connection with the Delta Ignition Switch Defect are also false. While New GM claimed that it was unaware that the unintended movement of the ignition switch in its cars rendered the front airbags inoperable until shortly before the 2014 recall, it has now been forced to admit to the contrary. In the DPA, New GM finally began to come clean and admitted that, at least by the spring of 2012, it was fully aware that the Delta Ignition Switch Defect rendered airbags inoperable, and that a recall was required.

99. Plaintiffs believe that New GM had more than enough knowledge that the Delta Ignition Switch Defect was a safety defect such that it should have done a recall in 2009.

100. New GM has now effectively admitted that the Delta Ignition Switch Defect alone is responsible for 124 deaths—and New GM bears responsibility for all the deaths that occurred on its watch after July 10, 2009.

101. New GM's now highly publicized campaign of deception in connection with the Delta Ignition Switch Defect first revealed in February 2014 sent shockwaves throughout the country. Unfortunately, the Delta Ignition Switch Defect announced in February 2014 was only one of a parade of recalls in 2014—many concerning safety defects that had long been known to New GM.

102. On May 16, 2014, New GM entered into a Consent Order with NHTSA in which it admitted that it violated the TREAD Act by not disclosing the Delta Ignition Switch Defect, and agreed to pay the maximum available civil penalties for its violations.

103. New GM's CEO, Mary Barra, has admitted in a video message that: "Something

went wrong with our process…, and terrible things happened." But that admission is cold comfort for Plaintiffs and Class members, who have suffered economic injury as a result of New GM's deception.

104.    New GM systematically and repeatedly breached its obligations and duties to Defective Vehicle owners to make truthful and full disclosures concerning New GM vehicles and Old GM vehicles—particularly, the safety, quality, and reliability of the vehicles, and the importance of safety and quality to the Company. New GM's false representations and/or omissions concerning the safety and reliability of those vehicles, and its concealment of the known safety defects plaguing those vehicles and its brand, caused certain Plaintiff and Class members to purchase New GM vehicles or New GM Certified Pre-Owned Vehicles on or after July 10, 2009, under false pretenses, and caused owners of Old GM Defective Vehicles to retain and use Defective Vehicles of diminished value.

105.    Plaintiffs have been damaged by New GM's conduct, misrepresentations, concealment, and non-disclosure of the numerous defects plaguing over 15 million Old and New GM Defective Vehicles—all vehicles which New GM has the obligation and responsibility to monitor for safety, and to disclose and remedy known safety defects. Once that truth emerged and consumers became aware that New GM concealed known safety and quality defects in the Defective Vehicles, the Defective Vehicles were greatly tarnished by the revelation of the defects and the fact that the Company is untrustworthy and does not stand behind its vehicles. This decline in value is also a conservative proxy for the amount of overpayment at the time of sale, though there exists other methods to quantify the damage. The value of the Defective Vehicles, has therefore diminished and continues to diminish because of New GM's failure to timely disclose and remedy the defects.

106.    A few examples of the decline in value caused by New GM's conduct are illustrative of the diminution in value that harmed Plaintiffs and Class Members: the 2010 and the 2011 Chevrolet Camaro have both seen a diminished value of $2,000 when compared to the value of comparable vehicles; the 2009 Pontiac Solstice has diminished $2,900 in value; the 2010 Cadillac STS diminished in value by $1,235 in September 2014; and the 2010 Buick LaCrosse by $649 in that same month. To take a few more examples: the 2011 Chevrolet Caprice has a diminished value as of April 2015 of $1,679; and the 2011 GMC Denali, as of April 2015, has a diminished value of $2,965. New GM's egregious and widely publicized conduct and the never-ending and piecemeal nature of New GM's recalls has so tarnished the New GM brand and specific models that no Class member would have paid the price they did when the New GM brand supposedly meant safety and success.

107.    The problems with the Plaintiffs' vehicle was not unique. The Subject Vehicles were some of many vehicles subject to recent recall(s) relating to a large number of GM vehicles' ignition switches and electronic stability control systems. Recall notices were issued by New GM for certain makes of its vehicles, including the Plaintiffs' vehicles, throughout 2014. In these recalls, New GM issued notices to the National Highway Traffic Safety Administration ("NHTSA"), notifying it of recalls to include the vehicles mentioned in Paragraph 21 of this Complaint.  The total number of vehicles affected by these recalls is in the millions.

108.    Between 2003 and 2010, over 1.3 million Old GM and New GM vehicles in the United States were sold with a safety defect that causes the vehicle's electric power steering ("power steering") to suddenly fail during ordinary driving conditions and revert back to manual steering, requiring greater effort by the driver to steer the vehicle and increasing the risk of collisions and injuries.

109.    The affected vehicles are model year 2004-2006 and 2008-2009 Chevrolet Malibu, 2004-2006 Chevrolet Malibu Maxx, 2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2005-2006 and 2008-2009 Pontiac G6, 2004-2007 Saturn Ion, and 2008-2009 Saturn Aura vehicles. All of these recalls were covered by Safety Recall 14v153.

110.    In a March 28, 2014 letter to NHTSA, New GM described the Power Steering Defect as follows: "The subject vehicles equipped with electric power steering (EPS) may experience a sudden loss of power steering assist that could occur at any time while driving."

111.    Thus, New GM has admitted that all models involved in Safety Recall 14v153 have a common defect.

112.    New GM internally described the effect of the defect as follows: In its March 28, 2014 letter to NHTSA, New GM acknowledged that steering that requires greater driver effort at low vehicle speeds "could result in an increased risk of a crash." Thus, New GM has admitted that the effect of the defect is the same for all models involved in Safety Recall 14v153.

113.    As with the ignition switch defects and many of the other defects, New GM was aware of the Power Steering Defect long before it took anything approaching full remedial action.

114.    From the date of its inception, New GM knew that, in 2003, Old GM began receiving customer complaints regarding loss of power steering in Ions, and in 2004, Old GM instituted a "Customer Satisfaction program" for 2004 Malibus in which dealers were instructed to replace the steering column if a customer complained. Despite acknowledging the problem, no recall was initiated.

115.    New GM knew that, in response to a NHTSA Preliminary Investigation into potential Power Steering Defect in the 2005-2006 Pontiac G6, Old GM extended warranty coverage for the 2005-06 G6 and 2005 Malibu and Malibu Maxx to replace the steering column

assembly. No recall was done.

116. In 2010, New GM first recalled MY 2005-2010 Chevy Cobalts and MY 2007-2010 Pontiac G5s for these power steering issues, yet it did not recall the many other vehicles that had the same Power Steering Defects. Moreover, the Valukas Report found that New GM's recall was not motivated by customer safety but by the desire to avoid further government scrutiny: "Alan Adler, GM's manager for safety communications, remembered that GM had initially been planning to categorize the electric power-steering issue as a customer satisfaction issue, but as a result of the congressional scrutiny of Toyota and the unintended acceleration issues, it was agreed that GM should issue a safety recall before the hearings so that 'we would not get mentioned or dragged in to the Senate.'" Valukas Report at 140.

117. New GM enacted a series of "half measures" well short of a safety recall for other models that would not ultimately be recalled until 2014. In June 2010, New GM approved Special Coverage for model year 2004-2007 Saturn Ions, extending EPS warranty to 10 years or 100,000 miles and instructing dealers to replace power steering motors under Service Bulletin 10187 for customers who complained. A similar Special Coverage program was initiated in June for the following models: (i) Chevrolet Malibu and Malibu Maxx MY 2005-2006 and 2008; (ii) Pontiac G6 MY2006; (iii) Saturn Aura MY 2008, and (iv) Saturn Ion MY 2004-2007. And in July 2010, New GM issued Service Bulletins to provide special coverage to replace the power steering motor for (i) certain Saturn Ion MY 2004-2007, (ii) Malibu and Malibu Maxx MY 2005- 2006 and 2008; (iii) Pontiac G6 MY 2006; and (iv) Saturn Aura MY 2008. Yet, again, no safety recall was initiated.

118. In December 2010, GM Canada issued a recall for EPS defects in 2003-07 Ion and 2006-10 HHR—models equipped with the same EPS motor as the 2005-2010 Cobalts and G5's recalled earlier. But New GM did not issue a recall in the United States, although NHTSA had

begun investigating.

119.    In October 2012, GM Canada issued a notice of defect for certain Malibu, Malibu Maxx, G6, and Aura vehicles, although it would take almost two more years for New GM to recall those vehicles in the United States.

120.    Documents released by NHTSA show that New GM waited years to recall nearly 335,000 Saturn Ions for power-steering failure—despite receiving nearly 4,800 consumer complaints and more than 30,000 claims for warranty repairs. That translates to a complaint rate of 14.3 incidents per thousand vehicles and a warranty claim rate of 9.1 percent. By way of comparison, NHTSA has described as "high" a complaint rate of 250 complaints per 100,000 vehicles.

121.    Here, the rate translates to 1,430 complaints per 100,000 vehicles.

122.    In response to the consumer complaints, in September 2011, NHTSA opened an investigation into the Power Steering Defect in Saturn Ions.

123.    NHTSA has linked approximately 12 crashes and two injuries to the Power Steering Defect in the Ions. The first injury was reported in May 2007, and was known to New GM from the date of its inception.

124.    In September 2011, after NHTSA began to make inquiries about the safety of the Saturn Ion, New GM acknowledged that it had received almost 3,500 customer reports claiming a sudden loss of power steering in 2004-2007 Ion vehicles.

125.    The following month, New GM engineer Terry Woychowski informed current CEO Mary Barra—then head of product development—that there was a serious power-steering issue in Saturn Ions, and that it may be the same power steering issue that plagued the Chevy Cobalt and Pontiac G5. Ms. Barra was also informed of the ongoing NHTSA investigation. At the

time, NHTSA reportedly came close to concluding that Saturn Ions should have been included in New GM's 2010 steering recall of Cobalt and G5 vehicles.

126.    Instead of recalling the Saturn Ion, New GM sent dealers a service bulletin in May of 2012 identifying complaints about the steering system in the vehicle.

127.    By the time New GM finally recalled the Saturn Ion in March 2014, NHTSA had received more than 1,200 complaints about the vehicle's power steering. Similar complaints resulted in over 30,000 warranty claims with New GM.

128.    After announcing the March 31, 2014 recall, Jeff Boyer, New GM's Vice President of Global Vehicle Safety, acknowledged that New GM recalled some of these same vehicle models previously for the *same issue*, but that New GM "did not do enough."

129.    According to an analysis by the NEW YORK TIMES published on April 20, 2014,

130.    New GM has "repeatedly used technical service bulletins to dealers and sometimes car owners as stopgap safety measures instead of ordering a timely recall."

131.    Former NHTSA head Joan Claybrook echoed this conclusion, stating, "There's no question that service bulletins have been used where recalls should have been."

132.    NHTSA has recently criticized New GM for issuing service bulletins on at least four additional occasions in which a recall would have been more appropriate and in which New GM later, in fact, recalled the subject vehicles.

133.    These inappropriate uses of service bulletins prompted Frank Borris, the top defect investigator for NHTSA, to write to New GM's product investigations director, Carmen Benavides, in July 2013, complaining that "GM is slow to communicate, slow to act, and, at times, requires additional effort . . . that we do not feel is necessary with some of [GM's] peers."

134.    Mr. Borris' correspondence was circulated widely among New GM's top

executives including John Calabrese and Alicia Boler-Davis, two vice presidents for product safety; Michael Robinson, vice president of regulatory affairs; engineer Jim Federico; Gay Kent, director of product investigations who had been involved in safety issues with the Cobalt since 2006; and William Kemp, an in-house product liability lawyer.

## V.    PLAINTIFFS' USE OF THE SUBJECT VEHICLES AND/OR IGNITION SWITCH AND RESULTING INJURY

135.    Plaintiffs incorporate by reference all the above paragraphs as if set forth in full herein.

136.    Plaintiffs bring this action to recover damages resulting from injuries suffered as a direct and proximate result of their use of the Subject Vehicles and/or ignition switches.

137.    Plaintiffs' use of the Subject Vehicles and/or ignition switches and electronic stability control systems caused Plaintiffs' injuries and resulting damages, and deaths. During Plaintiffs' operation of the Subject Vehicles and/or ignition switches and electronic stability control systems, the Subject Vehicles and/or ignition switches were used in a manner reasonably foreseeable to Defendant. The Subject Vehicles and/or ignition switches and/or electronic stability control systems were defectively designed, unreasonably dangerous, inadequately tested, dangerous to human health, untimely and belatedly recalled, and lacked proper warnings as to the dangers associated with their use by Plaintiffs.

138.    Plaintiffs have suffered serious physical injuries and or damages from deaths of family members, and related damages as a direct and proximate result of the Subject Vehicles and/or ignition switches and electronic stability control systems. Plaintiffs' injuries necessitate continued medical treatment for the foreseeable future.

139.    Prior to Plaintiffs' use of the Subject Vehicles and/or ignition switches and electronic stability control systems, Defendant knew or should have known of the risks associated

with the operation of the Subject Vehicles and/or ignition switches and/or electronic stability control systems and possessed the means to provide adequate warning regarding the risks associated with the Subject Vehicles and/or ignition switches and/or electronic stability control systems. Had Plaintiffs been adequately warned that the Subject Vehicles and/or ignition switches and/or electronic stability control systems could cause serious injury and/or death, they would have not have used the Subject Vehicles and/or ignition switches and/or electronic stability control systems.

140.    As a direct and proximate result of Defendant's conduct, Plaintiffs were unaware and could not reasonably know, or through the exercise of reasonable diligence could not have known, that the Subject Vehicles and/or ignition switches and/or electronic stability control systems exposed Plaintiffs to the risks and injuries alleged herein.

141.    As a direct and proximate result of Defendant's conduct, Plaintiffs suffered physical injuries, death and related damages. Further, the Plaintiffs have sustained in the past, and will sustain in the future, physical pain and suffering, disfigurement, physical impairment, a reasonable and traumatic fear of an increased risk of additional injuries, progression and aggravation of existing physical conditions, and other serious injury and loss.

142.    Plaintiffs also have suffered and will sustain past and future general and special damages, including past and future medical care and treatment, lost wages, and lost earning capacity.

143.    As a direct and proximate result of Defendant's conduct and/or the Subject Vehicles and/or ignition switches and/or electronic stability control systems, Plaintiffs have incurred, and will continue to incur for the foreseeable future, medical, nursing, diagnostic, hospital, pharmaceutical, rehabilitative, and other related costs and expenses for Plaintiffs' treatment and

care, along with lost wages, lost earning capacity, and other damages for which they are entitled to compensation. Further, Plaintiffs have suffered wrongful death damages for the deaths of family members as set forth above, including but not limited to loss of love, companionship, guidance and affection, lost past and future earnings and household contributions, and all other statutorily allowed wrongful death damages. Said amounts are above the jurisdiction amount for this Court, but the exact amounts are unknown at this time. Plaintiffs do not seek any compensation for accidents prior to July 10, 2009. Further, Plaintiffs are not seeking any economic loss of use of the Subject Vehicles or reduction in value of the Subject Vehicles.

144.    Plaintiffs are entitled to punitive damages because Defendant's own conduct from July 10, 2009 to the present was reckless, intentional, with evil and malice, and without regard for the Plaintiffs' and the public's safety and welfare. Defendant misled both the automotive community and the public at large, including the Plaintiffs, by making false representations about the safety of the Subject Vehicles and/or ignition switches and/or electronic stability control systems and concealing known defects. Defendant downplayed, understated, concealed and/or disregarded its knowledge of the serious risks and unreasonable dangers associated with the Subject Vehicles and/or ignition switches and/or electronic stability control systems. Nevertheless, Defendant continued to market the Subject Vehicles and/or ignition switches and/or electronic stability control systems by providing false and misleading information with regard to their safety and efficacy. Defendant's conduct constitutes a willful, despicable, fraudulent, malicious, oppressive, reckless, and conscious disregard for the rights of Plaintiffs and the public.

145.    Defendant is liable to the Plaintiffs for all damages, punitive damages, and all other relief to which Plaintiffs are entitled to by law or equity.

**VI.    CAUSES OF ACTION**

## COUNT I:
## STRICT LIABILITY - MANUFACTURING DEFECT

146.    Plaintiffs hereby incorporate by reference each and every paragraph set forth in this Complaint as if fully copied and set forth at length herein.

147.    Defendant designed, selected, inspected, tested, assembled, equipped, manufactured, marketed, distributed, and/or sold or otherwise placed into the stream of commerce the Subject Vehicles, including the Plaintiffs' vehicles, and component parts thereof, including but not limited to, equipping them with an ignition switch, steering system, rollover sensing system, and crash protection system with design, manufacturing, and/or marketing defects, more particularly set forth herein.

148.    Defendant had a legal duty to design, inspect, test, manufacture, and assemble the Subject Vehicles, including the Plaintiffs' vehicles, and the component parts so that they would be reasonably crashworthy and provide a reasonable degree of occupant safety in foreseeable collisions occurring in the highway environment of its expected use.

149.    At all times relevant herein, the Subject Vehicles, including the Plaintiffs' vehicles, and component parts thereof, including the ignition switch, were expected to reach, and did reach, consumers throughout the United States without substantial change in the condition in which they were sold.

150.    It was foreseeable to Defendant that the Subject Vehicles would be sold to consumers throughout the United States, including the sale of the Plaintiffs' vehicles, and used in the manner for which they were intended by the Defendant.

151.    At all times relevant herein, the Subject Vehicles were designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Defendant in a defective and unreasonably dangerous condition at the time they were placed in the

stream of commerce in ways which include, but are not limited to, one or more of the following:

    (a) the Subject Vehicles, including their component parts, which includes their ignition switches, electronic stability control, and steering systems contained manufacturing defects;

    (b) the ignition switches in the Subject Vehicles were inadequately designed and manufactured;

    (c) the Subject Vehicles, including their component parts, which includes their ignition switches, were not made in accordance with Defendant's specifications or performance standards;

    (d) the Subject Vehicles, as designed and manufactured, lack crashworthiness sufficient to comply with occupant protection standards; and/or

    (e) the Subject Vehicles, as designed and manufactured, lack appropriate airbag sensors to protect occupants in a roll over vehicle crash.

152.    The manufacturing defects of the Subject Vehicles, including the Plaintiffs' vehicles, occurred while the product was in the possession and control of the Defendant.

153.    The manufacturing defects of the Subject Vehicles, including the Plaintiffs' vehicles, existed before they left the control of Defendant.

154.    It was foreseeable to Defendant that the Subject Vehicles and their component parts, including the ignition switch, which were manufactured, designed, inspected, tested, assembled, equipped, distributed, and/or sold or otherwise placed into the stream of commerce would fail and cause users and consumers like the Plaintiffs to be unable to control said vehicles and be involved in a collision.

155.    As a direct and proximate result of the foregoing acts and omissions, the Plaintiffs suffered severe and permanent physical injuries. They have endured, and will continue to endure, substantial pain and suffering. They have incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the future. Plaintiffs have lost past earnings and have suffered a loss of earning capacity. Plaintiffs have suffered and will continue to suffer

economic loss, and have otherwise been physically and economically injured. Their injuries and damages are permanent and will continue into the future. For the plaintiffs who bring claims of wrongful death and/or survival actions, those Plaintiffs have suffered loss of companionship, guidance, time with, and support of, the deceased family member. They have further suffered funeral expenses, past medical expenses, loss of economic support, lost past and future earnings, and lost household contributions and support. Plaintiffs seek actual and punitive damages from Defendant as alleged herein.

WHEREFORE, Plaintiffs each pray for judgment in Count I against Defendant for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, costs herein expended, punitive damages to punish and deter any such conduct in the future and such other relief as the Court deems just and proper under the circumstances.

## COUNT II:
## STRICT LIABILITY - DESIGN DEFECT

156.    Plaintiffs hereby incorporate by reference each and every paragraph set forth in this Complaint as if fully copied and set forth at length herein.

157.    Defendant designed, selected, inspected, tested, assembled, equipped, manufactured, marketed, distributed, and/or sold or otherwise placed into the stream of commerce the Subject Vehicles, including the Plaintiffs' vehicles, and component parts thereof, including but not limited to, equipping them with an ignition switch, steering system, rollover sensing system, and crash protection system with design, manufacturing, and/or marketing defects, more particularly set forth herein.

158.    Defendant had a legal duty to design, inspect, test, manufacture, and assemble the Subject Vehicles, including the Plaintiffs' vehicles, and the component parts so that they would be reasonably crashworthy and provide a reasonable degree of occupant safety in foreseeable

collisions occurring in the highway environment of its expected use.

159.    At all times relevant herein, the Subject Vehicles, including the Plaintiffs' vehicles, and component parts thereof, including the ignition switch and steering system, were expected to reach, and did reach, consumers throughout the United States without substantial change in the condition in which they were sold.

160.    It was foreseeable to Defendant that the Subject Vehicles would be sold to consumers throughout the United States, including the sale of the Plaintiffs' vehicles, and used in the manner for which they were intended by the Defendant.

161.    At all times relevant herein, the Subject Vehicles were designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Defendant in a defective and unreasonably dangerous condition at the time they were placed in the stream of commerce in ways which include, but are not limited to, one or more of the following:

(a)    having an ignition switch that is inadequately designed and located, which may result in the key moving from the "Run" to "Accessory" or "Off" position during normal driving maneuvers;

(b)    having an ignition switch that allows the Plaintiffs' vehicles to stall or lose engine power, and steering and/or full braking ability while driving;

(c)    having frontal airbags that may not deploy when the key is in the accessory/off position;

(d)    lacking adequate occupant protection and/or airbag sensors to protect vehicle occupants during rollover crashes; and,

(e)    have a defective electronic stability control system and steering system that causes the vehicle driver to lose control as normal speeds;

(f)    failing to adequately warn the Plaintiffs, other consumers, or the public in general, about the unsafe and defective condition and design of the vehicle known to GM, so that individuals like the Plaintiffs could make informed and prudent decisions regarding the purchase and/or use of such vehicles.

162.    When placed in the stream of commerce, the Subject Vehicles were defective in

design, in that they were not reasonably fit, suitable, or safe for their intended purpose and/or their foreseeable risks exceed the benefits associated with their design, making the use of the Subject Vehicles more dangerous than an ordinary consumer would expect, and more dangerous than risks associated with alternatives.

163.    45. In addition, at the time the Subject Vehicles left the control of the Defendant, there were practical and feasible alternative designs of the Subject Vehicles and their component parts, including the ignition switches that would have prevented and/or significantly reduced the risk of Plaintiffs' injuries without impairing the reasonably anticipated or intended function of the Subject Vehicles. These safer alternative designs were economically and technologically feasible, and would have prevented or significantly reduced the risk of Plaintiff's injuries without substantially impairing the Subject Vehicle's utility.

164.    As a direct and proximate result of the foregoing acts and omissions, the Plaintiffs suffered severe and permanent physical injuries. They have endured, and will continue to endure, substantial pain and suffering. They have incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the future. Plaintiffs have lost past earnings and have suffered a loss of earning capacity. Plaintiffs have suffered and will continue to suffer economic loss, and have otherwise been physically and economically injured. Their injuries and damages are permanent and will continue into the future. For the plaintiffs who bring claims of wrongful death and/or survival actions, those Plaintiffs have suffered loss of companionship, guidance, time with, and support of, the deceased family member. They have further suffered funeral expenses, past medical expenses, loss of economic support, lost past and future earnings, and lost household contributions and support. Plaintiffs seek actual and punitive damages from Defendant as alleged herein.

WHEREFORE, Plaintiffs each pray for judgment in Count II against Defendant for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, costs herein expended, punitive damages to punish and deter any such conduct in the future and such other relief as the Court deems just and proper under the circumstances.

## COUNT III:
## STRICT LIABILITY - FAILURE TO WARN

165.    Plaintiffs hereby incorporate by reference each and every paragraph set forth in this Complaint as if fully copied and set forth at length herein.

166.    Defendant designed, selected, inspected, tested, assembled, equipped, manufactured, marketed, distributed, and/or sold or otherwise placed into the stream of commerce the Subject Vehicles, including the Plaintiffs' vehicles, and component parts thereof, including but not limited to, equipping them with an ignition switch, steering system, rollover sensing system, and crash, manufacturing, and/or marketing defects, more particularly set forth herein.

167.    Defendant had a legal duty to design, inspect, test, manufacture, and assemble the Subject Vehicles, including the Plaintiffs' vehicles, and the component parts so that they would be reasonably crashworthy and provide a reasonable degree of occupant safety in foreseeable collisions occurring in the highway environment of its expected use.

168.    At all times relevant herein, the Subject Vehicles were expected to reach, and in fact did reach, consumers throughout the United States without substantial change in the condition in which they were sold.

169.    At all times relevant herein, the Subject Vehicles, including the Plaintiffs' vehicles and component parts thereof, including the ignition switch system, were expected to reach, and did reach, consumers throughout the United States without substantial change in the condition in which they were sold.

42

170.    It was foreseeable to Defendant that the Subject Vehicles would be sold to consumers throughout the United States, including the sale of the Plaintiffs' vehicles, and used in the manner for which they were intended by the Defendant.

171.    At all times relevant herein, the Subject Vehicles, including the Plaintiffs' vehicles, were defective and unreasonably dangerous when they left the possession of Defendant in that they contained warnings insufficient to alert consumers and users, including the Plaintiffs herein, of the dangerous risks associated with the defective condition of the Subject Vehicles, notwithstanding Defendant's knowledge of the dangerous risks, including but not limited to the following:

(a)    having an ignition switch that is inadequately designed, constructed, and/or located, which may result in the key moving from the "Run" to "Accessory" or "Off" position during normal driving maneuvers;

(b)    having an ignition switch that allows the Plaintiffs' vehicles to stall or lose engine power, and steering and/or full braking ability while driving;

(c)    having frontal airbags that may not deploy when the key is in the accessory/off position; and,

(d)    lacking adequate occupant protection and/or airbag sensors to protect vehicle occupants during rollover crashes; and

(e)    have a defective electronic stability control system and steering system that causes the vehicle driver to lose control as normal speeds;

(f)    failing to adequately warn the Plaintiffs, other consumers, or the public in general, about the unsafe and defective condition and design of the Subject Vehicles known to GM, so that individuals like the Plaintiffs could make informed and prudent decisions regarding the purchase and/or use of such vehicles.

172.    The Plaintiffs could not, by the exercise of reasonable care, have discovered the defects herein mentioned and perceived their danger.

173.    Defendant knew or should have known of the risks of the defective condition of the Subject Vehicles and their component parts.

43

174.    Additionally, Defendant, as manufacturer, designer, distributor, and/or seller of the Subject Vehicles is held to the level of knowledge of an expert in the field.

175.    The Plaintiffs reasonably relied upon the skill, superior knowledge and/or judgment of Defendant.

176.    Defendant had a duty to warn the Plaintiffs and consumers of the dangers associated with the Subject Vehicles and their component parts, including the ignition switch.

177.    Despite Defendant's knowledge of the risks of the defective condition of the Subject Vehicles and their component parts, Defendant failed to adequately warn the Plaintiffs and consumers of those risks.

178.    Had the Plaintiffs received adequate warnings regarding the unsafe and defective condition of the Subject Vehicles and their risks, they would not have purchased and/or used such vehicle.

179.    As a direct and proximate result of the foregoing acts and omissions, the Plaintiffs suffered severe and permanent physical injuries. They have endured, and will continue to endure, substantial pain and suffering. They have incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the future. Plaintiffs have lost past earnings and have suffered a loss of earning capacity. Plaintiffs have suffered and will continue to suffer economic loss, and have otherwise been physically, emotionally, and economically injured. Their injuries and damages are permanent and will continue into the future. For the plaintiffs who bring claims of wrongful death and/or survival actions, those Plaintiffs have suffered loss of companionship, guidance, time with, and support of, the deceased family member. They have further suffered funeral expenses, past medical expenses, loss of economic support, lost past and future earnings, and lost household contributions and support. Plaintiffs seek actual and punitive

damages from Defendant as alleged herein.

WHEREFORE, Plaintiffs each pray for judgment in Count III against Defendant for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, costs herein expended, punitive damages to punish and deter any such conduct in the future and such other relief as the Court deems just and proper under the circumstances.

## COUNT IV
## NEGLIGENCE

180.    Plaintiffs hereby incorporates by reference each and every paragraph set forth in this Complaint as if fully copied and set forth at length herein.

181.    Defendant was negligent in designing, selecting, inspecting, testing, assembling, equipping, manufacturing, marketing, distributing, and/or selling or otherwise placing into the stream of commerce the ignition switch which was selected and installed in the Subject Vehicles, including the Plaintiffs' vehicles.

182.    Defendant had a duty to individuals, including Plaintiffs, to use reasonable care in designing, selecting, inspecting, testing, assembling, equipping, manufacturing, marketing, distributing, and/or selling or otherwise placing into the stream of commerce the ignition switch which was selected and installed in the Subject Vehicles, including the Plaintiffs' vehicles.

183.    Defendant was negligent in failing to use reasonable care as described here in designing, selecting, inspecting, testing, assembling, equipping, manufacturing, marketing, distributing, and/or selling or otherwise placing into the stream of commerce the ignition switch which was selected and installed in the Subject Vehicles, including the Plaintiffs' vehicles. Defendant breached its aforementioned duty by:

(a) Failing to design the ignition switch, the power control modules, and/or the airbag protection systems so as to avoid an unreasonable risk of harm to drivers, users, and occupants, including Plaintiffs, of the Subject Vehicles, including the Plaintiffs'

vehicles;

(b) Failing to manufacture the ignition switch, the power control modules, and/or the airbag protection systems so as to avoid an unreasonable risk of harm to drivers, users, and occupants of the Subject Vehicles, the Plaintiffs' vehicles, including Plaintiffs;

(c) Failing to use reasonable care in the testing of the ignition switch, the power control modules, and/or the airbag protection systems so as to avoid an unreasonable risk of harm to drivers, users, and occupants of the Subject Vehicles, including the Plaintiffs' vehicles, including Plaintiffs;

(d) Failing to use reasonable care in inspecting the ignition switch the power control modules, and/or the airbag protection systems so as to avoid an unreasonable risk of harm to drivers, users, and occupants of the Subject Vehicles, including the Plaintiffs' vehicles, including Plaintiffs; and,

(e) Otherwise negligently or carelessly designing, selecting, inspecting, testing, assembling, equipping, manufacturing, marketing, distributing, and/or selling or otherwise placing into the stream of commerce the ignition switch which was selected and installed in the Subject Vehicles, including the Plaintiffs' vehicles;

(f) lacking adequate occupant protection and/or airbag sensors to protect vehicle occupants during rollover crashes; and

(g) having a defective electronic stability control system and steering system that causes the vehicle driver to lose control as normal speeds.

184.    Defendant also negligently failed to warn or instruct the Plaintiffs and/or others that the defects were selected and installed in the Subject Vehicles, including the Plaintiffs' vehicles, had an unsafe and defective condition and design which was known to Defendant.

185.    As a direct and proximate result of the foregoing acts and omissions, the Plaintiffs suffered severe and permanent physical injuries. They have endured, and will continue to endure, substantial pain and suffering. They have incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the future. Plaintiffs have lost past earnings and have suffered a loss of earning capacity. Plaintiffs have suffered and will continue to suffer economic loss, and have otherwise been physically and economically injured. Their injuries and damages are permanent and will continue into the future. For the plaintiffs who bring claims of

wrongful death and/or survival actions, those Plaintiffs have suffered loss of companionship, guidance, time with, and economic and social support of, the deceased family member. They have further suffered funeral expenses, past medical expenses, loss of economic support, lost past and future earnings, and lost household contributions and support. Plaintiffs seek actual and aggravating/punitive damages from Defendant as alleged herein.

WHEREFORE, Plaintiffs each pray for judgment in Count IV against Defendant for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, costs herein expended, punitive damages to punish and deter any such conduct in the future and such other relief as the Court deems just and proper under the circumstances.

## COUNT V
## BREACH OF WARRANTY

186.    Plaintiffs hereby incorporate by reference each and every paragraph set forth in this Complaint as if fully copied and set forth at length herein.

187.    When Defendant placed the Subject Vehicles into the stream of commerce, Defendant knew or should have known of the use for which they were intended and expressly and impliedly warranted to Plaintiffs that the use of the Subject Vehicles were safe and acceptable.

188.    Plaintiffs reasonably relied upon the expertise, skill, judgment and knowledge of Defendant and upon the express and/or implied warranty that the Subject Vehicles were of merchantable quality and fit for use as intended.

189.    The Subject Vehicles were not of merchantable quality and were not safe or fit for their intended use because it was unreasonably dangerous and unfit for the ordinary purpose for which they are used in that it caused injury to Plaintiffs. Defendant breached the warranty because the Subject Vehicles were unduly dangerous in expected use and did indeed cause undue injury to Plaintiffs.

190.    As a direct and proximate result of Defendant's breach of warranty of merchantability, Plaintiffs were seriously and permanently injured, and/or killed. This Count only seeks damages for physical injury and death and their related consequences as set forth above and below, and does not seek any damages for economic loss of use or reduction in value of the Subject Vehicles.

WHEREFORE, Plaintiffs each pray for judgment in Count I against Defendant for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, costs herein expended, punitive damages to punish and deter any such conduct in the future and such other relief as the Court deems just and proper under the circumstances.

**COUNT VI**
**FRAUDULENT CONCEALMENT**

191.    Plaintiffs hereby incorporate by reference each and every paragraph set forth in this Complaint as if fully copied and set forth at length herein.

192.    At all times during the course of dealing between Defendant and Plaintiffs and the general public, Defendant misrepresented the safety of the Subject Vehicles, including the Plaintiffs' vehicles, for their intended use.

193.    Defendant knew or was reckless in not knowing that its representations were, in fact, false.

194.    In representations to Plaintiffs and the general public, Defendant fraudulently concealed and intentionally omitted material information, including but not limited to, the fact that:

(a) the Subject Vehicles were manufactured and/or designed negligently, defectively, and/or improperly in that the ignition switches and other systems as set forth above were installed in the Subject Vehicles are, by their nature, loose and/or improperly positioned and are susceptible to failure during normal and expected conditions;

(b) the keys sold with the Subject Vehicles have a slot design which allows the key fob or chain to hang lower on the key and increases the chance of the key inadvertently moving from the "Run" to "Accessory" or "Off" position during ordinary driving maneuvers (the "Ignition Switch Defect"); and,

(c) when this ignition switch failure occurs, the motor engine and certain electrical components such as power-assisted steering and anti-lock brakes are turned off, thereby endangering the vehicle occupants and compromising the vehicle safety system.

195.   Defendant was under a duty to disclose to Plaintiffs and consumers the defective nature of the Subject Vehicles, including, but not limited to, the Ignition Switch Defect, electronic stability control defect, steering defect, crashworthiness defects, and lack of rollover airbag sensor defect.

196.   Defendant had sole access to material facts concerning the defective nature of the Subject Vehicles and its propensity to cause serious and dangerous side effects, and hence cause damage to persons who used the Subject Vehicles, including Plaintiffs in particular.

197.   Defendant's concealment and omissions of material facts concerning, inter alia, the safety of the Subject Vehicles was made purposefully, willfully, wantonly, and/or recklessly, to mislead Plaintiffs and consumers into reliance on the use of the Subject Vehicles, and to cause them to purchase and/or use the product.

198.   Defendant knew that consumers had no way to determine the truth behind Defendant's concealment and omissions, as set forth herein.

199.   Plaintiffs reasonably relied on facts revealed which negligently, fraudulently, and/or purposefully did not include facts that were concealed and/or omitted by Defendant.

200.   As a direct and proximate result of the foregoing acts and omissions, the Plaintiffs suffered severe and permanent physical injuries. They have endured, and will continue to endure, substantial pain and suffering. They have incurred significant expenses for medical care and

treatment, and will continue to incur such expenses in the future. Plaintiffs have lost past earnings and have suffered a loss of earning capacity. Plaintiffs have suffered and will continue to suffer economic loss, and have otherwise been physically and economically injured. Their injuries and damages are permanent and will continue into the future. For the plaintiffs who bring claims of wrongful death and/or survival actions, those Plaintiffs have suffered loss of companionship, guidance, time with, and support of, the deceased family member. They have further suffered funeral expenses, past medical expenses, loss of economic support, lost past and future earnings, and lost household contributions and support. Plaintiffs seek actual and punitive damages from Defendant as alleged herein.

WHEREFORE, Plaintiffs each pray for judgment in Count V against Defendant for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, costs herein expended, punitive damages to punish and deter any such conduct in the future and such other relief as the Court deems just and proper under the circumstances.

## COUNT VII
## STATUTORY ACTIONS

201.    Plaintiffs hereby incorporate by reference each and every paragraph set forth in this Complaint as if fully copied and set forth at length herein.

202.    For all claims that are subject to a state product liability statutory regime, those claims are brought under the applicable state statutes as follows:

- For Plaintiffs whose claims are subject to Michigan's products liability statute(s), those claims are brought pursuant to Mich. Comp. Laws. Ann. §§ 600.2945 *et seq*.

- For Plaintiffs whose claims are subject to the Utah Product Liability Act, those claims are brought pursuant to Utah Code Ann. §§ 78B-6-701 *et seq*.

WHEREFORE, Plaintiffs each pray for judgment in Count V against Defendant for

damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, costs herein expended, punitive damages to punish and deter any such conduct in the future and such other relief as the Court deems just and proper under the circumstances.

## COUNT VIII
## PUNITIVE DAMAGES

203.    Plaintiffs hereby incorporate by reference each and every paragraph set forth in this Complaint as if fully copied and set forth at length herein.

204.    While New GM expressly accepted responsibility for accident occurring on or after July 10, 2009, it also acquired knowledge of Old GM's activities generally, and the existence of the defective ignition switches and or electronic stability control defects in place in millions of vehicles specifically. New GM acquired personnel, documents, and electronic data from Old GM, including but not limited to, top leadership personnel, executives, members of the Board of Directors, internal legal counsel, engineers and quality control personnel. Most importantly, New GM retained the engineer in charge of designing and approving the manufacturing specifications of the defective ignition switch. The employees retained by New GM carried with them the knowledge they gained at Old GM. New GM also acquired knowledge about the issues with the ignition switch, moving stalls and airbag non-deployment through the chief engineer, design and manufacturing documents, internal memorandum, and reports to the Board of Directors. New GM continued to service – and to receive complaints about – vehicles manufactured on Old GM's watch.

205.    New GM also acquired certain duties with regard to vehicles in production and on the road at the time of the Sale and Purchase Agreement – duties it breached egregiously – as has been well-publicized and for which it has been justifiably criticized. These duties included, but are not limited to, those arising under the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. §

and the Transportation Recall Enhancement, Accountability and Documentation Act, 49 U.S.C. §§ 30101-30170. GM was fined $35 Million by NTSHA for its delayed reporting of the ignition switch problem and violating federal safety laws.

206.    New GM's liability for damages is attributable to its own post-sale conduct and failure to timely remedy and/or recall vehicles it knew had deadly defects, even with regard to vehicles manufactured and sold prior to the Sale and Purchase Agreement.

207.    Defendant sold the Subject Vehicles, including the Plaintiffs' vehicles, to consumers without doing adequate testing to ensure that the Subject Vehicles were reasonably safe for their use and intended purposes.

208.    Defendant sold the Plaintiffs' vehicles in spite of its knowledge that the ignition switches can unexpectedly and suddenly move from the "On" or "Run" position while the vehicles are in operation to the "Off" or "Accessory" position, and despite full knowledge of the other defects listed in this Complaint, thereby causing severe injuries suffered by Plaintiffs and numerous other individuals.

209.    Defendant ignored reports of consumers, which began as early as 2004 and continue to the date of the recalls in this case, regarding the ignition switch of certain GM vehicles with the same or similar ignition switches throughout the United States and elsewhere of the products' failures to perform as intended, which led to the severe injuries suffered by Plaintiffs and numerous other individuals.

210.    Defendant knew of the Subject Vehicles' defective and unreasonably dangerous nature, but continued to manufacture, market, distribute, and sell the products so as to maximize sales and profits at the expense of the health and safety of the public.

211.    Defendant, through its conduct in designing, testing, manufacturing, assembling,

marketing, selling, and failing to adequately repair the Plaintiffs' vehicles purchased and/or used by Plaintiffs, demonstrated willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifferent to consequences, thereby justifying an award of punitive damages.

212.    Plaintiffs would further allege that the clear and convincing evidence in this case will show that Defendant acted with reckless disregard for the rights of plaintiffs' rights and/or actual malice with evil intent in that when viewed objectively from the standpoint of the Defendant at the time of the occurrence, there was an extreme danger of risk considering the probability and magnitude of potential harm to others, and of which Defendant had actual, subjective awareness of the risk involved, but nevertheless proceeded with indifference to the rights, safety, or welfare of others, including the Plaintiffs. Therefore, punitive damages are sought and should be assessed against Defendant for its conduct from July 10, 2009 to the present and as allowed under the Agreement to the maximum amount allowed by applicable law.

WHEREFORE, Plaintiffs respectfully request that in addition to actual damages, they be awarded an additional amount as and for punitive damages in their favor and against Defendant, in an amount which will serve to punish Defendant and deter Defendant and others from like conduct in the future.

## COUNT IX
## VIOLATION OF UTAH CONSUMER SALES PRACTICES ACT
### (UTAH CODE ANN. § 13-11-1, et seq.)

213.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

214.    The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

215.    Plaintiffs purchased a Subject Vehicle.

216.    New GM is a "supplier" under the Utah Consumer Sales Practices Act ("Utah CSPA"), UTAH CODE ANN. § 13-11-3.

217.    Plaintiffs are "persons" under UTAH CODE ANN. § 13-11-3.

218.    The sale of the Defective Vehicles to Plaintiffs was a "consumer transaction" within the meaning of UTAH CODE ANN. § 13-11-3.

219.    The Utah CSPA makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction" under UTAH CODE ANN. § 13-11-4. Specifically, "a supplier commits a deceptive act or practice if the supplier knowingly or intentionally: (a) indicates that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not" or "(b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not." UTAH CODE ANN. § 13-11-4. "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA. UTAH CODE ANN. § 13-11-5.

220.    New GM committed deceptive acts or practices in the conduct of trade or commerce, by, among other things, engaging in unconscionable acts, representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; and representing that the Defective Vehicles are of a particular standard, quality, and grade when they are not.

221.    In the course of its business, New GM concealed the defects in Plaintiffs' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact

with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective Vehicles. The defects in each vehicle include not only the specific defect (e.g., the Delta Ignition Switch), but also include the defective process through which New GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process. All of these defective processes would be material to a reasonable consumer.

222.    From the date of its inception on July 10, 2009, New GM knew of serious defects affecting the Defective Vehicles owned or leased by Plaintiffs, because of (i) the knowledge of Old GM personnel who transferred to New GM; (ii) Old GM documents and databases that transferred to New GM; (iii) continuous reports, investigations, and notifications from regulatory authorities; and (iv) ongoing performance of New GM's TREAD Act obligations, as discussed above. New GM acquired additional information concerning the serious defects and safety issues impacting Plaintiffs' vehicles years ago, but concealed all of that information until its forced revelation in 2014.

223.    By failing to disclose and by actively concealing the defects in Plaintiffs' vehicles, which it marketed as safe, reliable, and of high quality, New GM engaged in unfair and deceptive business practices in violation of the Utah CSPA.

224.    In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' vehicles.

225.    New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their

vehicles.

226.    New GM intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with the intent to mislead Plaintiffs.

227.    New GM knew or should have known that its conduct violated the Utah CSPA.

228.    As alleged above, New GM made material statements about the safety and reliability of the Defective Vehicles and the New GM brand that were either false or misleading.

229.    New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Defective Vehicles because New GM:

    a.    Possessed exclusive knowledge about the defects in the Defective Vehicles;

    b.    Intentionally concealed the foregoing from Plaintiffs;

    c.    Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

230.    Because New GM fraudulently concealed the defects in New GM vehicles, New GM Defective Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects.

231.    Further, Plaintiffs had to spend their time and money to bring their Defective Vehicles in for repair.  Had New GM Defective Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective Vehicles or would have paid less for them.

232.    Old GM Defective Vehicle owners were also harmed by New GM's unfair and deceptive trade practices since their vehicles were worth less as the result of New GM's concealment of, and failure to remedy, the defects. Further, once the truth came out about the

defects, the value of Old GM Defective Vehicles greatly decreased to well-below the value the vehicles would have had in the absence of the defect. This diminished value is directly attributed to New GM's dishonesty and omissions with respect to the quality and safety of the Defective Vehicles.

233.    New GM's concealment of the defects in Plaintiffs' vehicles was material to Plaintiffs.

234.    Plaintiffs suffered ascertainable loss caused by New GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles. Plaintiffs who purchased New GM Defective Vehicles or New GM Certified Pre-Owned Defective Vehicles after the date of New GM's inception either would have paid less for their vehicles or would not have purchased or leased them at all.

235.    Regardless of the time of purchase or lease, no Plaintiffs would have maintained and continued to drive their Defective Vehicles had they been aware of New GM's misconduct.

236.    By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively undertook the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers. 49 U.S.C. § 30118(c). New GM had an ongoing duty to all Defective Vehicle owners to refrain from unfair and deceptive acts or practices under the Utah CSPA—regardless of when those owners acquired their vehicles.

237.    New GM's violations present a continuing risk to Plaintiffs as well as to the general public. In particular and as alleged herein, New GM's purported "fix" for the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles is inadequate and those cars are therefore still defective. New GM's unlawful acts and practices complained of herein affect the public interest.

238.    As a direct and proximate result of New GM's violations of the Utah CSPA, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above. As a direct result of New GM's misconduct, all Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles.

239.    Pursuant to UTAH CODE ANN. § 13-11-4, Plaintiffs seek monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each Plaintiff, reasonable attorneys' fees, and any other just and proper relief available under the Utah CSPA.

## COUNT X
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## (UTAH CODE ANN. § 70A-2-314)

240.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

241.    Plaintiffs purchased a Subject Vehicle.

242.    New GM was at all relevant times a merchant with respect to motor vehicles.

243.    New GM impliedly warranted that its vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use—transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public. This warranty was implied by law in the transactions when Plaintiffs purchased or leased their Defective Vehicles from New GM on or after July 10, 2009.

244.    The Defective Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

245.    The Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the

attendant shut down of power steering and power brakes and the non-deployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

246.    The Power Steering Defect Vehicles are inherently defective in that there are defects in the vehicles that can cause the loss of power steering assist, resulting in an increased risk of accident.

247.    The Side Airbag Defect Vehicles are inherently defective in that there are defects in the wiring harness connectors that can cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

248.    New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and others before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

249.    As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**COUNT XI**
**UNJUST ENRICHMENT**

250.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

251.    The claims in this Count are Independent Claims, and challenge only the conduct of New GM.

252.    Plaintiffs purchased a Subject Vehicle.

253.    This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

254.    New GM has received and retained a benefit from Plaintiffs and inequity has resulted.

255.    New GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

256.    With respect to the Defective Vehicles purchased before New GM came into existence that were still on the road after New GM came into existence and as to which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

257.    Thus, all Plaintiffs conferred a benefit on New GM.

258.    It is inequitable for New GM to retain these benefits.

259.    Plaintiffs were not aware of the true facts about their Defective Vehicles, and did not benefit from New GM's conduct.

260.    New GM knowingly accepted the benefits of its unjust conduct.

261.    As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**DAMAGES**

262.    Plaintiffs hereby incorporate by reference each and every paragraph set forth in this Complaint as if fully copied and set forth at length herein.

263.    Because of Plaintiffs' bodily injuries or death proximately caused by Defendant's conduct, Plaintiffs are entitled to reasonable and proper compensation for the following legal damages:

a. past and future medical expenses and charges;

b. past and future physical pain and anguish;

c. past and future physical impairment;

d. past and future disfigurement;

e. past lost wages and future lost wage-earning capacity;

f. loss of guidance, love and companionship for wrongful death;

g. loss of household contributions for wrongful death; and,

h. All other economic and non-economic damages allowed for wrongful death, but at no time are any Plaintiffs seeking loss of use or reduction of value of their vehicles in this action.

264.    Plaintiffs seeks actual and punitive damages to be awarded by the jury in an amount in excess of the minimum jurisdictional limits of this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter a judgment against New GM and in favor of Plaintiffs and the Classes and Subclasses, and grant the following relief:

A.    Declare, adjudge, and decree the conduct of New GM as alleged herein to be unlawful, unfair, and/or deceptive and otherwise in violation of law, enjoin any such future conduct, and issue an injunction under which the Court will monitor New GM's response to problems with the recalls and efforts to improve its safety processes, and will establish by Court decree and administration under Court supervision a program funded by New GM under which claims can be made and paid for Defective Vehicle owners and lessees' out-of-pocket expenses and costs;

B.    Award Plaintiffs and Class Members actual, compensatory damages or, in the

alternative, statutory damages, as proven at trial;

C.    Plaintiffs seeks actual and punitive damages to be awarded by the jury in an amount in excess of the minimum jurisdictional limits of this Court.

D.    Award Plaintiffs and the Class Members exemplary damages in such amount as proven;

E.    Award damages and other remedies, including, but not limited to, statutory penalties, as allowed by any applicable law, such as the consumer laws of the various states;

F.    Award Plaintiffs and the Class Members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest;

G.    Award Plaintiffs and Class Members restitution and/or disgorgement of New GM's ill-gotten gains relating to the conduct described in this Complaint; and

H.    Award Plaintiffs and the Class Members such other further and different relief as the case may require or as determined to be just, equitable, and proper by this Court.

## DEMAND FOR JURY TRIAL

Plaintiffs specifically demand a trial by jury of all claims asserted in this Complaint.

Dated: 4/21/2017              By:    /s/ Tiffany M. Yiatras
                                     Tiffany M. Yiatras, appearing *pro hac vice*
                                     Carey, Danis & Lowe
                                     8235 Forsyth Boulevard, Suite 1100
                                     St. Louis, Missouri  63011
                                     Tele: 314-725-7700
                                     Email: tyiatras@careydanis.com

                             **ATTORNEY FOR PLAINTIFFS**